IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**JULIE RAMIREZ**,                                              Civil Case No. 09-684-KI

             Plaintiff,

                                                    OPINION AND ORDER

    vs.

**COMMISSIONER SOCIAL SECURITY
ADMINISTRATION**,

             Defendant.


    Tim D. Wilborn
    Wilborn Law Office, P.C.
    P.O. Box 2768
    Oregon City, Oregon  97045

             Attorney for Plaintiff

    Dwight C. Holton
    United States Attorney
    District of Oregon


Page 1 - OPINION AND ORDER

Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon  97204

David J. Burdett
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington  98104-7075

       Attorneys for Defendant

KING, Judge:

Julie Ramirez brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her  application for Disability Insurance benefits ("DIB") under Title II of the Social Security Act.

## PROCEDURAL BACKGROUND

Ms. Ramirez filed an application for benefits on May 23, 2003, with an alleged onset date of October 11, 2002.   Administrative law judge ("ALJ") John J. Madden, Jr. issued a decision on January 24, 2006, finding Ms. Ramirez not disabled.  Ms. Ramirez sought judicial review in this court.  Ramirez v. Astrue, No. CV 06-1310-MO.  The court adopted the parties' stipulated motion for remand on September 26, 2007.  The remand directed the ALJ to "re-evaluate Plaintiff's mental impairment," "discuss and evaluate the opinion of John Kofoed, M.D., and either accept that opinion or provide legally sufficient reasons for rejecting it," and "re-evaluate the nature and severity of each of Plaintiff's impairments and provide rationale for the conclusions reached regarding the specific limitations resulting therefrom."  Tr. 485-86.  By

Page 2 - OPINION AND ORDER

decision dated August 20, 2008, the ALJ again found Ms. Ramirez not disabled.  The Appeals

Council denied review, making the ALJ's decision final.

Ms. Ramirez was born in 1953 and was 55 years old at the time of the ALJ's second

decision.  She has a high school education.  She has not engaged in substantial gainful activity

since October 11, 2002.  Her past relevant work was as a residential counselor for emotionally

disturbed teenagers.  She has also provided behavior management, classroom instruction, life

skills instruction, and community integration management to high school and middle school

students with autism and other disabilities, and worked as a job coach and developer for clients

with disabilities.  After the first hearing, she worked part-time, for approximately eight months,

as an after-school tutor and childcare provider for a 15-year-old autistic child.  Beginning in

February 2007, she provided childcare to two children, ages one and three, at her home three

days a week for five to seven hours a day.

Ms. Ramirez alleges disability on the basis of a vestibular disorder, degenerative disc

disease of the cervical and lumbar spine, fibromyalgia, osteoarthritis, asthma, and major

depressive disorder.  Her insured status for purposes of DIB expired on December 31, 2007; she

must therefore prove she was disabled on or before that date.  20 C.F.R. § 404.131.

## STANDARD

The court must affirm the Commissioner's decision if it is based on proper legal standards

and the findings are supported by substantial evidence in the record as a whole.  Meanel v. Apfel,

172 F.3d 1111, 1113 (9th Cir. 1999).  However, the Commissioner's decision must be upheld

even if "the evidence is susceptible to more than one rational interpretation."  Andrews v. Shalala,

53 F.3d 1035, 1039-40 (9th Cir. 1995).

Page 3 - OPINION AND ORDER

The initial burden of proving disability rests on the claimant.  Meanel, 172 F.3d at 1113.

To meet this burden, the claimant must demonstrate an "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment" which

"has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42

U.S.C. § 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner has established a five-step sequential process for determining whether

a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520,

416.920.  At step one, the Commissioner determines whether the claimant has engaged in any

substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, the Commissioner

goes to step two, to determine whether the claimant has a "medically severe impairment or

combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c),

416.920(c).  That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which
> significantly limits your physical or mental ability to do basic work activities, we
> will find that you do not have a severe impairment and are, therefore, not disabled.
> We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c).  If the impairment is severe, the evaluation proceeds to the third

step, where the Commissioner determines whether the impairment meets or equals "one of a

number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude

substantial gainful activity." Yuckert, 482 U.S. at 140-41.  If a claimant's impairment meets or

equals one of the listed impairments, she is considered disabled without consideration of her age, education or work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant shows an inability to perform her past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity ("RFC") to do other work in consideration of the claimant's age, education and past work experience.  Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

## MEDICAL EVIDENCE

Ms. Ramirez saw Christopher J. Molitor, an orthopedic surgeon, on June 29, 2000 for low back and left hip pain.  She reported that her symptoms had been going on for about three months, having "started insidiously without specific inciting incident."  Tr. 183.  Dr. Molitor noted a history of chronic low back pain, with a laminectomy in 1988.  Dr. Molitor diagnosed trochanteric bursitis, for which he gave her an injection.

Ms. Ramirez was treated by William Klas, M.D., between February 2001 and October 2002.  Initially, she was seen for depression and anxiety related to working a night shift at the residential treatment facility and caring for her grandson during the day.  Dr. Klas started her on Paxil, which she reported was helpful.  She continued to see Dr. Klas for chronic insomnia, which Dr. Klas considered situational.  In June 2001, Ms. Ramirez reported that she had stopped taking the Paxil because of its side effects, but that she was no longer depressed. On August 24, 2001, Ms. Ramirez reported that she had been arrested four days earlier, for transporting drugs

Page 5 - OPINION AND ORDER

into a correctional facility.  On September 24, 2001, Ms. Ramirez saw Dr. Klas for left shoulder pain and complaints of depression and anxiety.  In November 2001, Ms. Ramirez again complained of decreased ability to sleep, and of body aches on her left side.  On February 12, 2002, Ms. Ramirez said that although the Ambien helped her sleep, she was using it infrequently.

On May 3, 2002, Dr. Klas noted that Ms. Ramirez was awaiting sentencing after entering a guilty plea to one felony, and that it was "likely [she] will be forced to leave her current job." Tr. 215.  He gave her a sample of Zoloft.  On May 16, 2002, Dr. Klas noted "depression in past nine months, secondary to arrest and threatened job loss." Tr. 214.  Ms. Ramirez told him she had entered a guilty plea because of the difficulty of withstanding trial "given mood disorder" and "divorce in progress." Id.  However, Dr. Klas also noted that she reported doing better on Zoloft.  On July 23, 2002, Dr. Klas noted that Ms. Ramirez "expects to lose job due to arrest" and "pending state licensing board" proceedings. Tr. 213.  Dr. Klas wrote that Ms. Ramirez's depression was "currently stable," although "job uncertainty prevents resolution for now." Id.  On August 9, 2002, Dr. Klas diagnosed fibromyalgia, based upon 18 tender points.

On September 2, 2002, Ms. Ramirez saw Dr. Klas for diffuse mild muscular pain in her shoulder, neck, hips, back and hands.  Ms. Ramirez told Dr. Klas that she intended to pursue disability.  Dr. Klas noted that he would await a rheumatology evaluation for long term determination of her functional status.  On September 12, 2002, Dr. Klas wrote a note to Ms. Ramirez's employer stating that until October 15, 2002,  she was not to perform activities that required bending, twisting or lifting over 10 pounds, and could not be involved in physical altercations, restraints, or activities that required pushing or pulling objects weighing more than 20 pounds.  However, she had no limitations on sitting, standing or walking.  On October 4,

2002, Ms. Ramirez saw Dr. Klas for hand pain, which she described as "burning" when she gripped things. She also said she had been assaulted at work on October 2, 2002. Dr. Klas wrote a note to her employer stating that Ms. Ramirez had been "placed in unsafe situation at work which is contrary to her previously directed medical limitations." Tr. 198. He ordered her taken off work "unless her work situation can completely comply with prior restriction noted 9/12/02." Id. Ms. Ramirez filed a worker's compensation claim for repetitive motion injuries to her hands on October 10, 2002. On October 11, 2002, she was terminated from her employment.

On October 14, 2002, Ms. Ramirez was evaluated by rheumatologist JaNahn Scalapino. Ms. Ramirez reported fibromyalgia symptoms worsening over the previous two to three years, with generalized soreness, poor sleep, and pain through the lateral hips and low back, aggravated with prolonged sitting. Ms. Ramirez told Dr. Scalapino she had positive tender points for fibromyalgia and, despite trials of several medications, was still in pain and not sleeping well. However, she was exercising regularly, walking her dog more than three miles a day, sometimes twice a day, although she could not go to the gym because she "hurt[] so much for days afterwards." Tr. 175. Ms. Ramirez also reported "striking pain" in her fingers that "sends me through the roof" with any light blows or firm grip. Id. She said she had been dropping things, and that her hands stiffened up with inactivity. Ms. Ramirez also complained of chronic low back pain with persistent loss of sensation in the left lower leg, and depression for the past two to three years. She had side effects from Paxil and Celexa, but Zoloft was "fairly well tolerated." Tr. 176. Ms. Ramirez also said she had memory loss, tinnitus, poor balance, dry mouth, slightly blurred vision, and intermittent palpitations and asthma symptoms. Upon examination, Dr. Scalapino found some tenderness of the spine, particularly over the mid to lower lumbar region,

where she had a well-healed midline laminectomy scar.  She had diffuse tender points of

fibromyalgia.  Cervical mobility was mildly decreased in extension but "fairly good" in other

planes.  Tr. 177.  Lumbar mobility was "reasonably good."  Id.  Fists were nearly full.  She had

tenderness in both hands, but without synovitis.  Wrists, elbows, shoulders, hips and knees

moved well despite diffuse tenderness. Her gait was "just a bit unsteady on turns." Id.

Dr. Scalapino concurred with Dr. Klas's fibromyalgia diagnosis.  Dr. Scalapino did not

think the fibromyalgia disabled her "as much as the hand pain."  Id. Dr. Scalapino also diagnosed

early osteoarthritis of the hands that would "normally not be disabling in a more sedentary

position."  Tr. 177-78.  Apparently unaware that Ms. Ramirez had already been terminated from

her job, Dr. Scalapino said she would take Ms. Ramirez off work, commenting that she needed

"to be looking for something in another area, probably finance."  Tr. 178.  Dr. Scalapino also

diagnosed low back pain; vestibular dysfunction and "some balance problems;" mild asthma, on

medication as needed; and depression, "reasonably controlled on Zoloft."  Id.

On December 17, 2002, orthopedist Ronald Wolfson, M.D., conducted an independent

medical evaluation, in conjunction with the workers' compensation claim Ms. Ramirez had filed

the day before her termination.  Ms. Ramirez said she had been experiencing pain in her back,

neck and other joints for about two years, and stiffness and pain in both hands for about a year.

In addition, she said, she had difficulty sleeping, even with medication, and some difficulty with

her memory.  She reported a major injury in 1985 which eventually resulted in a lumbar

discectomy, but no other major injuries.  Ms. Ramirez said she had "always been healthy," and

had recovered well from her back surgery but the fibromyalgia had caused some depression.  Tr.

257.  Ms. Ramirez told Dr. Wolfson she had been terminated because her employer could not accommodate Dr. Klas's restrictions.

Dr. Wolfson's examination of the neck and upper extremities revealed limitation of motion and guarding when moving her neck from side to side.  He also noted "inappropriate tenderness in her right shoulder and radiation into her right arm when light pressure is applied to her head" and that, when light pressure was applied to the right neck and trapezius area, she reported radiation of pain down into her right arm.  Tr. 258.  Dr. Wolfson found no tenderness or muscle spasms.  Reflexes were normal.  Ms. Ramirez complained of pain in the joints of her fingers, but she had full range of motion and negative Tinel's and Phalen's tests.  Sensation was intact.  When Dr. Wolfson tested grip strength, she "put out a totally inadequate effort and exaggerated the examination."  Tr. 259.  She had no arm or forearm atrophy, and had full range of motion in her shoulders, elbows, forearms, wrists and hands.  Examination of her back revealed that she had tenderness in her upper and lower back to light touch, positive leg raising in the sitting position, and a less positive straight leg raising in the supine position.  Dr. Wolfson found "no evidence of osteoarthritis at all."  He concluded, "I strongly believe this case, because of the exaggerated examination . . .  and no credible history, should be denied."  Tr. 260.

On January 14, 2003, Ms. Ramirez saw Carol Foley, a nurse practitioner in Dr. Klas's office, and reported that she had been off antidepressants for two or three months because she could not afford them, although the Zoloft had been helpful, and Remeron was better. Ms. Ramirez said she was able to walk her dogs approximately three miles three to six times a week.

On April 13, 2003, Ms. Ramirez was evaluated by orthopedist John Kofoed, M.D. for bilateral hand pain and aching throughout her body as a result of fibromyalgia.  Ms. Ramirez told

Dr. Kofoed that she had had severe depression and a sleeping disorder for the past four years.

Dr. Kofoed noted that Ms. Ramirez was a "somewhat vague historian, as it is difficult to elicit

from her any particular injury which may have occurred through her work activities as a night

counselor for emotionally disturbed females."  Tr. 245. She apparently did not tell Dr. Kofoed

about the assault she had described to Dr. Klas of October 2, 2002, or the "very difficult

takedowns of assaultive clients" in late September 2002 she had described to Dr. Wolfson.  Ms.

Ramirez said she believed her injuries were cumulative, the result of her work at the treatment

center, which included slicing, chopping and grating food; sweeping and mopping; household

chores; and laundry.  Contradicting her December 2002 report to Dr. Wolfson of stiffness and

pain in both hands for the past year, she denied any previous problems with her hands.

  Ms. Ramirez acknowledged that she had been terminated from her job in October 2002,

and that she was currently collecting disability payments from the state.  She reported "full

recovery" from her  laminectomy in 1988.  Tr. 246.  Dr. Kofoed reviewed Ms. Ramirez's records

and performed a physical examination.  Her gait was normal; motor examination was intact with

regard to bulk, strength and tone throughout her upper and lower extremities; sensory

examination was intact throughout her upper and lower extremities; and she had full range of

motion in the lumbar spine, shoulders, elbows, wrists and hands.  Straight leg raising was

negative; reflexes were trace and symmetric in the lower extremities.  She had negative Phelan's

and Tinel's tests bilaterally.  Dr. Kofoed noted that Ms. Ramirez "describes tenderness

throughout her entire body which is minimal but diffuse."  Tr. 249.

  On September 25, 2003, Ms. Ramirez presented to the emergency room complaining of

neck and joint pain and stiffness over the last few days.  She reported having a history of

fibromyalgia and arthritis, and pain in "every joint" of her body.  Tr. 265.  She was given

analgesics and prednisone at the hospital and told to follow up with her primary care physician.

On September 30, 2003, Ms. Ramirez began seeing James Detwiler, M.D.  He refilled her

prescriptions for Darvocet, Zoloft, and Xanax.

On November 4, 2003, Michelle Whitehead, M.H.N.P., performed a psychodiagnostic

examination on Ms. Ramirez to assess depression and problems with memory and concentration.

Ms. Ramirez cited several problems, including sleep disorder, fibromyalgia, and nerve damage

and balance disorder from an injury in 1995.[1]  Ms. Ramirez said she fell on a weekly basis, and

had arthritis in "all my joints" with her wrists and hands most affected. Id. Ms. Ramirez said she

felt pain "throughout my entire body."  Id.

Ms. Ramirez told Dr. Whitehead she had been receiving disability from the state of

California, but that it ran out after a year; she "expressed frustration" that she was not eligible for

the Oregon Health Plan, and was "extremely frustrated and concerned about her future due to

help [sic] in financial issues."  Id.  Ms. Ramirez wrote on her patient information and history

form that pain and depression were overwhelming and that without medication, which she could

no longer afford, "her life was unbearable."  Id.

Ms. Ramirez related that her best friend and coworker had committed suicide the

previous April, and that she had found her friend's body.  Her third husband, Angel Ramirez,

was currently incarcerated in California for gang activity.  She had married Mr. Ramirez while he

---

[1] This is the first reference in the record to nerve damage from an injury in 1995.
Elsewhere in Dr. Whitehead's report, she indicates that when asked about medical injuries,
accidents or hospitalizations, Ms. Ramirez mentioned only back surgery in 1985 and the
fibromyalgia diagnosis in September 2002.

was in prison, four years previously.  Ms. Ramirez said she had moved to Oregon after being

falsely charged with smuggling drugs into the prison for her husband.  She had pleaded guilty to

one felony count, because of her deteriorating health and physical and emotional exhaustion.

Asked about injuries and accidents, Ms. Ramirez reported her laminectomy in 1985, and

her diagnoses of fibromyalgia and a sleeping disorder in September 2002.  Ms. Ramirez said she

had arthritis, but Dr. Whitehead noted that Dr. Wolfson had rejected that diagnosis.  Ms. Ramirez

said that because she could no longer afford medications, her depression, asthma and sleeping

disorder were becoming worse.

Ms. Ramirez said she was able to care for her dog and cat, and to shop with her mother.

She did her laundry at her mother's house.  She occasionally babysat with her grandsons, but said

she could not lift the baby.  She walked her older grandson to the school bus stop.  She said she

was unable to vacuum, but that she prepared some meals and used the microwave, drove and

used the telephone.  She took showers at her mother's house because of problems with balance.

Dr. Whitehead concluded:

> Julie presented as a fragile and extremely despondent and distressed woman who
> appeared overwhelmed with her daily life and general issues.  The level of stress
> has impaired her memory according to the claimant including not been [sic] able
> to recognize familiar faces or events.  However, she did not have difficulty with
> recall of general information, short-term facts and answering questions of a
> historical nature.  A neuropsychological screening to rule out the possibility of
> malingering may be indicated but the claimant's emotional issues are likely the
> main culprit for perceived memory loss.  An independent medical exam is
> recommended to further explore claimant's report of the physical problems.
> Secondary gains are considered a strong likely indicator for claimant seeking
> benefits.

Tr. 282.  Dr. Whitehead diagnosed major depression, single episode; rule out malingering.

Page 12 - OPINION AND ORDER

Blood tests done in October 2002 and September 2003 were negative for markers indicating arthritis, connective tissue disorders, or inflammation (sed rate, ANA, and RF factor).

Mary Ann Westfall M.D. and Sharon Eder, M.D. reviewed Ms. Ramirez's records on behalf of Social Security Administration and on November 12, 2003 completed a physical RFC Assessment. They concluded that Ms. Ramirez was able to lift up to 20 pounds occasionaly, and up to 10 pounds frequently, to sit, stand and walk for about six hours in an eight hour work day, and thus had the ability to do light work.

On approximately the same date, Frank Lahman, Ph.D and Bill Hennings, Ph.D. reviewed Ms. Ramirez's records and completed a mental RFC Assessment. In their opinion, the only limitation on her mental functioning was a moderate limitation on the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace.

On March 22, 2004, Ms. Ramirez was given a psychiatric evaluation by Marc Williams, M.D. at Deschutes County Mental Health. Ms. Ramirez reported a "history of being a kidnap victim"[2] and the recent loss of a friend by suicide. Tr. 334. Ms. Ramirez described a long history of sleep problems, dating back to 1988, when she "had a severe physical and head injury," including "a brain stem injury and vestibular injuries." Tr. 334.[3] She reported that she had had neurologic deficits since that time, as well as balance problems and significant light sensitivity. She also described chronic pain secondary to the accident and symptoms of

---

[2] This statement appears to be a reference to her first husband having "kidnaped" their son as Ms. Ramirez related to Dr. Whitehead.

[3] This is the first reference by Ms. Ramirez in the medical record of a head injury in 1988.

depression that had grown worse during the past year. She was very distressed about two

upcoming court appearances. She was taking Remeron for depression. She reported that her

mother had a history of depression and was on medication.

Dr. Williams wrote that Ms. Ramirez "apparently had no psychiatric problems until a

severe accident in 1988." He suggested that she follow up for support and further history, and to

assess whether her treatment for depression was adequate. He instructed her to return to him in

two months. However, it appears that she did not return.

On April 27, 2004, Ms. Ramirez was given a new patient evaluation by Joel Depper,

M.D. Ms. Ramirez said her symptoms of fibromyalgia and osteoarthritis went back to October

1985 when she was knocked off a ladder while working at a supermarket. She said she

developed severe balance problems afterward, and in 1988, developed generalized pain after a

laminectomy that year. She reported that she was eventually diagnosed with fibromyalgia in

2002, but that her family history was negative for fibromyalgia, although her mother had

osteoarthritis. Ms. Ramirez told Dr. Depper that Dr. Williams was treating her for post-traumatic

stress disorder because she had seen a co-worker commit suicide a year ago.[4]

Ms. Ramirez endorsed fatigue, irritability, depression, insomnia, impaired concentration,

impaired memory, anxiety, sugar cravings, sweating, palpitations, panic attacks, frontal

headache, generalized headaches, imbalance, blurred vision, eye irritation, nasal congestion,

abnormal taste, numbness, leg cramps, nausea, gas, bloating, constipation and diarrhea, pungent

---

[4] There is no indication in Dr. Williams's notes that he diagnosed post-traumatic stress
disorder, or that Ms. Ramirez told him she had seen a co-worker commit suicide. Dr. Williams
wrote only that Ms. Ramirez had "a recent crisis when a friend committed suicide." Tr. 334. In
her account of the friend's suicide to Dr. Whitehead, Ms. Ramirez said she had found her
friend's body, but not that she had seen her kill herself.

urine, weight changes, brittle nails, bruising, skin sensations, itching, rashes, and sensitivity to light, odor and sounds.  Physical examination was normal.  Musculoskeletal examination showed no specific abnormalities.  However, she was tender throughout her hands and fingers, including the shafts of her fingers between the joints.  Dr. Depper found "no joint swelling whatsoever," and wrists, elbows and shoulders, hips, knees, ankles and feet all had full range of movement. Tr. 329.  Motor strength was "remarkably preserved," although she had symmetrical 18 out of 18 positive trigger points.  Id.

Ms. Ramirez was hospitalized between February 25 and February 27, 2005 for acute asthma.  Ms. Ramirez saw Dr. Detwiler on March 2, 2005.  He noted that her asthma was poorly controlled with her present regimen, and changed her medications.  On March 14, 2005, Dr. Detwiler saw Ms. Ramirez for follow up of her asthma.  He wrote that she was "actually doing quite well," and had been off prednisone for about five days.  Tr. 365.  Ms. Ramirez said she had been under stress about the ex-girlfriend of her son, against whom she was filing a telephone harassment complaint.

On April 29, 2005, Dr. Detwiler wrote that Ms. Ramirez was "doing quite well" with her asthma, with her chest being "reasonably clear."  Tr. 364.  However, Ms. Ramirez related a number of stressors, including going through a child custody hearing and divorcing her husband. Id.  On July 28, 2005, Ms. Ramirez saw Dr. Detwiler for pain in her hands and wrists.  Dr. Detwiler found no deformity of the hand or wrist, but "pain to touch and muffled trigger points." Id. He was "not sure whether part of this is fibromyalgia or not."  Id.

On September 23, 2005, Ms. Ramirez saw James Stragand, M.D. for acid reflux.  She underwent an upper endoscopy, which revealed esophagitis.  She was started on Protonix.

According to a letter dated January 24, 2007, signed by Tess Migdol, a mental health therapist, Ms. Ramirez was her client at Deschutes County Mental Health beginning November 14, 2006.  However, Ms. Migdol stated that she had only met Ms. Ramirez once, for her initial assessment, and given her a tentative diagnosis of Major Depressive Disorder, recurrent, and possible Post Traumatic Stress Disorder.  Ms. Ramirez did not return.

On January 4, 2006, February 15, 2006, May 2, 2006, and June 13, 2006, Ms. Ramirez saw Dr. Detwiler for routine complaints (bruised knee, acid reflux, "tweaked" knee, and hot flashes).  On July 3, 2007, Ms. Ramirez saw Dr. Detwiler for complaints of pain and weakness in the right shoulder and arm for the past four weeks.  Dr. Detwiler referred Ms. Ramirez to Stephen Ireland, M.D., a neurologist.  Dr. Ireland's report, dated July 23, 2007, noted that motor examination "reveals giving way weakness in multiple muscles."  However, "with encouragement, it seems that most muscles are strong with the exception of the right biceps and brachioradialis."  Later in the examination, needle EMG examination was performed for multiple right upper extremity muscles, with normal results.  Sensory examination demonstrated no consistent abnormality.  Nerve conduction studies showed slight prolongation of the left median distal sensory latency, but otherwise the nerve conduction studies were normal.  Dr. Ireland did not think carpal tunnel accounted for weakness of the right biceps and brachioradialis.   Dr. Ireland recommended an MRI of the cervical spine.

On August 21, 2007, Dr. Ireland wrote a letter to Dr. Detwiler noting that the cervical MRI showed two potential sites of nerve root impingement, at C4-5 and at C5-6, but these abnormalities did not account for Ms. Ramirez's complaints of being unable to abduct her right

arm at the shoulder.  "In any case," Dr. Ireland wrote, "she seems to be getting better and there are no EMG findings of denervation."  Tr. 516.

On November 27, 2007, Ms. Ramirez saw Dr.Detwiler for complaints of pain in her left shoulder that had commenced with a bout of severe asthma with coughing and a pneumonia shot in the left arm two weeks earlier.  Ms. Ramirez denied weakness, numbness or loss of grip strength.  Physical examination revealed normal grip strength and "strongly intact" supinator and pronator muscles.  Deep tendon reflexes were equal. Tr. 556.

On January 21, 2008, Ms. Ramirez saw Kent Yundt, M.D., a neurologist, for left arm pain radiating into her fingers.  Dr. Yundt concluded that she had C6 and C7 radiculopathy, arising from spinal stenosis at C5-6.  He recommended anterior cervical discectomy and fusion (ACDF).  The surgery was performed on February 12, 2008, and at her six week postoperative visit on March 25, 2008, Ms. Ramirez told Dr. Yundt she was doing very well and no longer had any arm pain.

### HEARING TESTIMONY

I.    <u>2006 Hearing</u>

Ms. Ramirez testified that she had lost her job at the residential facility because her employer could not accommodate the work restrictions imposed by Dr. Klas.  She did not mention the felony conviction as a factor in her termination.  She was currently living with her mother, stepfather and seven year old grandson, of whom she had sole custody.  She was not receiving mental health counseling.  She took her grandson to school, but her mother did most of the cooking and grocery shopping.  Other than caring for her dog and cat, she had no other activities during the day.  Ms. Ramirez testified that for two or three days a week, after taking her

grandson to school, she was unable to "actually get up and do much of anything."  Tr. 417.  She

explained that she "physically [doesn't] get out of bed."  Tr. 417.  On the days she got out of bed,

she rolled out on her hands and knees and waited "for a minute and then you go from there."  Id.

She remained in bed throughout the day, except to go to the bathroom.  Ms. Ramirez said her

inability to get out of bed two or three days a week was a consistent pattern.

Ms. Ramirez said her hands were painful.  She could write "maybe two to three lines on a

piece of paper," but then had to stop.  Ms. Ramirez related that she had "muscle and nerve

damage," so that sometimes she picked things up and dropped them.  She said she had to "use

two hands for everything that I pick up."  Tr. 423.  She could only type by hunt and peck

because "it hurt[] less than using my hands."  Tr. 425.  Ms. Ramirez said her wrists and elbows

were "bothering me real bad," and that Dr. Detwiler had told her it was "the osteoarthritis [] just

moving like it does, apparently, through your body."  Tr. 425.  Ms. Ramirez said she averaged

two to four hours of sleep a night, but that "at least one or two days a week I don't sleep at all."

Tr. 428.  She was able to sit 10 to 15 minutes at a time and stand about the same amount of time.

Because of her balance problems, she said, she sometimes "fall[s] on my face."  Tr. 430.

Cleo Simons, Ms. Ramirez's mother, also testified.  She said,  "We neither one can

vacuum," but that they both did the grocery shopping.  Tr. 432.  Ms. Simons said her daughter

could not lift anything because she "loses her balance."  Id.  Ms. Simons also said her daughter

could not sit for "any length of time" and could not  "write for very long."  Id.

II.    2008 Hearing

Ms. Ramirez testified that since the last hearing, in 2006, she had worked part-time for

approximately eight months as an after-school tutor and childcare provider for a 15-year-old

autistic boy.  In February 2007, she had begun babysitting with two children, aged one and three, three days a week for five to seven hours.  She was still raising her grandson, now age 10.  Ms. Ramirez testified that her left arm pain was resolved, but that she still had pain in her neck, with muscle spasms that prevented her from looking down for more than a few minutes unless she took muscle relaxants.  Weakness in her hands, which she characterized as like a "faulty electrical switch,"  still caused her to drop things.  Tr. 582.

The ALJ called vocational expert ("VE") Patricia Ayerza.  The VE identified Ms. Ramirez's past relevant work in the Dictionary of Occupational Titles ("DOT") as residential counselor, identified in the DOT as a light exertion skilled job; teaching assistant, also a light, skilled job; skills trainer, a sedentary, skilled job; and job coach/job developer, a sedentary, skilled position.

The VE testified that "for the vast majority of" teaching assistant jobs, the DOT description of the work as light  "would be correct."  Tr. 595.  Ms. Ramirez described her  job coach/job developer position as one involving seeking out employment opportunities for special needs clients at local businesses, and then working with those clients at their jobs.  The VE testified that the job coach/job developer position in the DOT "describes basically what [Ms. Ramirez] described, promoting and developing employment and on the job training opportunities," and that "in most cases" it was performed as in the DOT description, and not with the physical demands Ms. Ramirez described.  Tr. 600.

The ALJ asked the VE to consider a hypothetical individual capable of work at the light exertion level.  The VE identified Ms. Ramirez's prior work as a teaching assistant, skills trainer, and job coach/job developer, as well as other jobs at the light level of exertion that would involve

Page 19 - OPINION AND ORDER

skills transferable from Ms. Enriquez's prior jobs, including information clerk and interviewer. The ALJ then asked the VE to consider whether Ms. Ramirez could do those jobs or any of her previous jobs as defined in the DOT with a limitation to only occasional handling and fingering, as found by Dr. Kofoed.  The VE responded that the job coach position, as defined in the DOT, and the information clerk job, could be performed by someone limited to only occasional reaching, handling and fingering.

## ALJ'S DECISION

The ALJ found that Ms. Ramirez had the following impairments that, in combination, were severe:  fibromyalgia, asthma, residuals of spinal surgery, obesity, insomnia/sleep disorder, and depression.  The ALJ rejected Ms. Ramirez's claims of balance problems because of inconsistencies between her testimony at the first hearing that they were the result of a 1985 injury, and other statements that they were the result of a 1995 nerve injury or a 1988 brain stem and vestibular injury. He found no objective medical evidence in the record supporting a brain or nerve injury in 1985, 1988 or 1995, nor any evidence that Ms. Ramirez had discussed her allegedly frequent falls with her medical practitioners or been treated for injuries resulting from falls.  The ALJ found that there were no objective medical findings, such as x-rays or lab workups, to support Dr. Scalapino's diagnostic impression of mild osteoarthritis, and that Ms. Ramirez's alleged osteoarthritis had been discredited by other physicians, such as Dr. Wolfson.

The ALJ concluded that Ms. Ramirez's depression had caused only mild limitations in three functional areas, according to the report from reviewing psychologists Lahman and Hennings, and that her depression was documented as well controlled with medication until exacerbated in 2002-2004 as a result of the circumstances surrounding her arrest and conviction.

He also found that Ms. Ramirez's ability to work as a tutor to an autistic teenager and as a childcare provider undermined the state agency psychologists' conclusion that she had moderate limitations in the areas of concentration, persistence and pace.

Based on the physical RFC assessment by Doctors Westfall and Eder, the ALJ concluded that Ms. Ramirez had the ability to engage in light work with some additional postural limitations and a sit/stand option as recommended by Dr. Kofoed.  However, the ALJ rejected Dr. Kofoed's limitation on repetitive hand motions for lack of objective medical findings to support such a limitation.  In any event, the ALJ observed, even when such a limitation was presented to the VE, she had identified both past work and other work that an individual so limited would be able to perform.  The ALJ observed that Ms. Ramirez acknowledged in the questionnaire accompanying her application for DIB that she had been authorized to do light work by her treating physician at the time she was terminated, "a factor that provides further support for the assessment of residual functional capacity in this decision."  Tr. 479.

The ALJ found not credible Ms. Ramirez's assertion in the same questionnaire that as of October 11, 2002, she was no longer able to physically perform her job as a night-shift counselor in a residential institution for emotionally disturbed teenagers, due to pain from fibromyalgia and osteoarthritis, asthma, a sleep disorder and severe depression. The ALJ cited Dr. Klas's notes reporting that Ms. Ramirez expected to lose her job due to the arrest, and that a review proceeding was pending before a state licensing panel; those notes contained no indication that Ms. Ramirez had reported symptoms affecting her ability to perform her job.  The ALJ contrasted Ms. Ramirez's reports to Dr. Klas about fearing the loss of her job because of the arrest, to

statements she made to Dr. Klas shortly before her termination that she was no longer able to

perform the physical demands of her job and was pursuing disability. The ALJ concluded,

> The timing of the claimant's rather sudden and previously unmentioned allegation
> that she was unable to perform the physical requirements of her job is considered
> highly suspect in view of her several admissions to Dr. Klas that she was facing
> termination due to her conviction for transporting drugs into a prison. The record
> strongly suggests that the claimant's decision to "pursue disability" was more
> likely influenced by her pending employment termination than by impairment-
> related symptomatology, and by the possibility that a criminal record would render
> her unqualified to seek other jobs in her area of work expertise.

Tr. 472.  The ALJ also questioned the veracity of Ms. Ramirez's claim that she had been

assaulted by a client on October 2, 2002, because it was not corroborated by documentation such

as an incident report from the employer, and because it was omitted from the worker's

compensation record assembled in connection with the disability claim she filed on October 10,

2002 for purported cumulative repetitive motion injuries to the hands.

The ALJ found not credible Ms. Ramirez's statements to Dr. Whitehead alleging a history

of chronic pain in all her joints, particularly her wrists and hands, and weekly falls.  The ALJ

cited Dr. Whitehead's observations that Ms. Ramirez drove herself to the examination and was

able to complete all paperwork with good handwriting.  The ALJ found Ms. Ramirez's assertions

of overwhelming depression and chronic pain excessive when "viewed from the context of the

minimal documentation of abnormality contained in treating source medical records."  Tr. 477.

He concluded that Dr. Whitehead's diagnosis of major depressive disorder appeared to be based

substantially upon Ms. Ramirez's subjective reports of physical and mental symptoms, and that

Dr. Whitehead had noted a need to rule out malingering.  As further support for his finding that

Ms. Ramirez lacked credibility, the ALJ cited to Dr. Williams's evaluation, in which Ms.

Ramirez described herself as a "kidnap victim," and gave a history of extreme physical injuries and abnormalities not corroborated by objective medical evidence or by other treating sources. The ALJ found Ms. Ramirez's alleged severe depression and chronic pain since 1988 inconsistent with her ability to engage in substantial gainful activity for nearly 15 years subsequent to 1988.  The ALJ also observed that Ms. Ramirez apparently had not disclosed to Dr. Williams her history of criminal conviction and termination from her last employment.

As further support for his credibility findings, the ALJ referred to Ms. Ramirez's statement to Dr. Whitehead in November 2003 that "family members on both sides have fibromyalgia," tr. 478, and the contradictory statement to Dr. Depper on April 27, 2004, denying any family history of fibromyalgia.  The ALJ observed that despite the extraordinary number of symptoms Ms. Ramirez endorsed to Dr. Depper, and her claim that she was unable to work because of extreme pain and loss of motor skills, Dr. Depper's examination revealed no evidence of joint abnormality, motor deficits, or restriction of range of motion. Indeed, "no physician of record has reported motor deficits or any other findings of abnormality that could reasonably be expected to produce the severe symptomatology she has alleged."  Tr. 479.

The ALJ found that the Dr. Detwiler's records documented routine medical care.  Dr. Detwiler reported no abnormal physical or mental findings and no comments by Ms. Ramirez suggesting the significant symptoms she had reported to Dr. Depper and Dr. Whitehead.  The ALJ cited Dr. Detwiler's March 14, 2005 repor that Ms. Ramirez was "doing quite well," with no restrictions noted on her capacity for normal activity or work-related tasks.  The ALJ also noted nothing in Dr. Stragand's report suggested that Ms. Ramirez had restrictions on her capacity for normal activity or work-related tasks.

Page 23 - OPINION AND ORDER

The ALJ found not credible Ms. Ramirez's testimony that she was unable to use her hands for any activity, to hold objects, or to write more than two or three lines.  He based this finding on the absence of any objective clinical signs of osteoarthritis, and on Dr. Wolfson's opinion that the arthritis diagnosis was "bogus."  Further, the ALJ found that Ms. Ramirez's testimony that she was unable to write more than two or three lines was contradicted by Dr. Whitehead's observation that she was able to complete paperwork without difficulty and that her handwriting skills were good.  The ALJ found not credible Ms. Ramirez's testimony at the first hearing that she had "muscle and nerve damage" because this assertion was "utterly unsupported by objective findings of abnormality or by any reports from a medical provider that could be considered remotely suggestive of muscle or nerve damage."  Tr. 479.

The ALJ disbelieved Ms. Ramirez's testimony at the first hearing that she stayed in bed because of pain two to three days a week. He found, "It appears that she is self-limiting her activities in a manner that is contrary to medical advice" from her physicians of record encouraging regular exercise, and her testimony was contrary to Dr. Klas's conclusion that she had no limits on her ability to sit, stand and walk. The ALJ discounted Ms. Ramirez's testimony that she fell on a weekly basis because the medical record gave no indication that she had ever sought treatment for an injury sustained as a result of a fall, and because she gave inconsistent accounts about when and how she had acquired her balance problems.

The ALJ found that "[s]everal physicians of record have noted invalid effort during examinations, non-anatomical clinical findings, and evidence of exaggeration of symptomatology," and that no treating or evaluating medical source had categorized Ms. Ramirez as disabled for any continuous 12-month period or "reported clinical findings of

Page 24 - OPINION AND ORDER

abnormality that could reasonably be considered inconsistent with a capacity to perform the . . . light work identified in this decision." Tr. 480. He found Ms. Ramirez's allegations of extreme symptomatology and limitation to be contradicted by the "relatively infrequent outpatient treatment she has sought," including the absence of treatment for severe pain or injuries. Tr. 480. He also noted that she had not been referred for surgery or a chronic pain management program, or treated aggressively with other conservative measures such as physical therapy.

The ALJ found that Ms. Ramirez's activities of daily living during her period of alleged disability belied her testimony that she suffered from severe depression, fell frequently, and was required to remain in bed all day two or three days a week; he cited her reports of walking her dog for three miles several times a week, caring for her grandchild, and doing in-home childcare for two small children three days a week for five to seven hours. The ALJ observed, "The claimant has not explained how she would schedule her symptoms to occur while she is not performing child care or how the parents of the children cared for could expect safe care from someone exhibiting the extreme symptoms alleged." Tr. 480.

The ALJ acknowledged that in 2007, Ms. Ramirez had seen Dr. Ireland for weakness of the right arm, but cited Dr. Ireland's opinion, after nerve conduction studies, that this was not caused by carpal tunnel syndrome. Dr. Ireland did write that a subsequent MRI showed degenerative disc disease with two potential sites of nerve root impingement, only one of which could potentially affect the right side, but he prescribed only conservative treatment. The ALJ found that "the record suggests that the claimant did not return for her follow-up." Tr. 481.

The ALJ also discussed the medical evidence of January 2008, after Ms. Ramirez's date last insured, from Dr. Yundt, who saw her for complaints of left arm and shoulder pain. The ALJ

found it noteworthy that Ms. Ramirez told Dr. Yundt she had no previous history of neck or

upper extremity issues.  Further, the ALJ noted that Ms. Ramirez's testimony at the second

hearing, as well as Dr. Yundt's treatment records, showed that she was doing well after the C5-7

fusion, with no arm pain and greatly decreased neck pain.

The ALJ considered the lay testimony of Ms. Simons and her answers to a questionnaire

dated July 24, 2003.  The ALJ noted that although Ms. Simons testified at the first hearing that

she resided with Ms. Ramirez, she failed to corroborate Ms. Ramirez's testimony that she was

bedridden several times a week.  In the questionnaire, Ms. Simons said her daughter could not

walk more than half a block to the mailbox, but the ALJ found this assertion contradicted by Ms.

Ramirez's admission to her doctor in the fall of 2002 that she was walking her dog

approximately three miles a day several times a week.  Although Ms. Simons testified that Ms.

Ramirez was unable to sit or use her hands for long, she did not corroborate her daughter's

testimony about falling, dropping things, and needing to hold objects with both hands.

At steps four and five, the ALJ found that Ms. Ramirez was unable to perform her past

relevant work, because as actually performed, it was at the medium to heavy exertional level.

However, the ALJ found that Ms. Ramirez had acquired work skills that were transferable from

her past relevant work, including communication, interviewing, performing evaluations, and

relaying information, based on the VE's testimony.  Accordingly, the ALJ accepted the VE's

testimony that Ms. Ramirez was capable of performing the jobs of information clerk, interviewer,

skills trainer, and job coach/developer.  The ALJ found that the VE also identified jobs Ms.

Ramirez could perform if she were restricted with respect to forceful gripping and lifting no more

than 25 pounds, as found by Dr. Kofoed.  These jobs were job coach, skills trainer, and information clerk.

## DISCUSSION

Ms. Ramirez asserts that the ALJ erred in 1) failing at steps two and three to find severe the impairments of major depressive disorder, vestibular disorder, hand impairment, degenerative disc disease of the cervical and lumbar spine, and carpal tunnel syndrome; 2) finding her mental impairment to be felony-related; 3) improperly classifying her past relevant work and acquired skills;  4) rejecting the opinions of Doctors Kofoed and Scalapino, as well as the state agency's opinions with respect to her mental impairments; 5) failing to make adequate findings on Ms. Ramirez's credibility; and 6) rejecting the lay witness testimony of Ms. Ramirez's mother, Cleo Simons.

I.    <u>Additional impairments at steps two and three</u>

An ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is "clearly established by medical evidence."  <u>Webb v. Barnhart</u>, 433 F.3d 683, 687 (9th Cir. 2005).

A.    <u>Major depressive disorder</u>.

Ms. Ramirez asserts that the ALJ erred in failing to include Major Depressive Disorder as a severe impairment.  I note initially that Dr. Whitehead's actual diagnosis was Major Depressive Disorder, single episode, rule out malingering, and that Ms. Migdol's diagnosis of Major Depressive Disorder, recurrent was provisional only, based solely on an initial assessment.  The ALJ rejected Dr. Whitehead's diagnosis in part because it was based primarily on Ms. Ramirez's own statements, which the ALJ found not credible.

Page 27 - OPINION AND ORDER

The ALJ found that major depressive disorder was not a severe impairment because reviewing psychologists Lahman and Hennings considered her only mental restriction to be a moderate limitation on the ability to complete a normal workday and workweek.  The ALJ found even this limitation contradicted by Ms. Ramirez's testimony that she had been working as a childcare provider and as a tutor to an autistic boy.  He also noted that the medical evidence indicate her depression was well controlled with medication before and after Ms. Ramirez was arrested and convicted of a felony.  I find no error here.  An impairment that is under control cannot support a finding of disability.  Celaya v. Halter, 332 F.3d 1177, 1185 (9th Cir. 2003) (Rawlinson, J., dissenting); Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1992) (upholding ALJ's finding of no disability where impairments were stabilized).

Dr. Klas's records contain numerous references to Ms. Ramirez's depression being stable on first Zoloft and then Remeron.  See, e.g., tr. 204 ("Zoloft helpful, Remeron was better"),  213 (depression stable), 214 (depression better on Zoloft), 219 ("she will taper off [Remeron] after she runs out of current meds . . . appears to be doing well").  Ms. Ramirez's subsequent medical records indicate that she continued taking Remeron, with no further complaints of depression to her treating physicians and no indication that the medication was not successful.

Ms. Ramirez also asserts that the ALJ committed reversible error by finding her depression symptoms between 2002 and 2004 arose or were aggravated in connection with the commission of a felony.  See 20 C.F.R. § 404.1506 (requiring exclusion from consideration of impairment or aggravation of preexisting impairment that arises in connection with a claimant's commission of a felony).  Social Security Ruling ("SSR") 83-21 clarifies that "in connection with" does not require a

causative connection between the commission of the felony and the disabling
condition, but it must be closely related to, or associated with the commission of
the offense.  In general, the disabling condition (the impairment or the aggravation
of a pre-existing impairment) must have occurred at a time and location that is
near (i.e., close to the time and place) to the felony.  Ordinarily, the decision as to
this issue will be obvious . . . .  [S]ome nontraumatic impairments may arise in
connection with the commission of a felony, since the law does not require that
there must be a causative relationship between the commission of the felony and
the impairment.

Ms. Ramirez argues that the ALJ committed legal error when he excluded consideration of Ms.

Ramirez's depression not on the ground that it was aggravated in connection with the

commission of a felony, but on the grounds that it was aggravated in connection with the

conviction of a felony that Ms. Ramirez feared might lead to her job termination.  This argument

is not persuasive, because no such distinction is made in the ALJ's actual finding:

> The overall evidence of record clearly demonstrates that the claimant's
> psychological condition was well-controlled until exacerbated in 2002-2004 due
> to the circumstances surrounding her felony commission/conviction . . . .
> Although the claimant now alleges that she was innocent, the undersigned is not
> in a position to readjudicate her plea bargain and conviction for a felony.

Moreover, the evidence relied upon by the ALJ does not support Ms. Ramirez's argument.  Ms.

Ramirez's complaints of renewed depression two months after reporting that she was no longer

depressed and no longer taking Paxil, commenced on August 24, 2001, four days after her arrest.

Dr. Klas's entry of May 16, 2002, when Ms. Ramirez reported that she had entered a guilty plea,

records "depression in past nine months, secondary to arrest and threatened job loss."  Tr. 214.

There is no indication that the ALJ's finding or the evidence the ALJ relied upon for that finding

was based on a causative connection between the conviction, rather than the commission, of a

felony.

Page 29 - OPINION AND ORDER

B.    <u>Vestibular disorder</u>

The ALJ found no clinical evidence suggesting a vestibular disorder and no indication that Ms. Ramirez was ever treated for injuries resulting from her alleged weekly falls, which she described at the first hearing as falling on her face.  He also cited Ms. Ramirez's inconsistent statements to various medical practitioners about the cause of this alleged disorder to support his finding that the alleged vestibular disorder was not a severe impairment.

When numerous medical examinations fail to disclose any underlying medical cause for ailments of which a claimant complains, and her conduct raises doubts about the integrity of her complaints, the ALJ can properly reject the claimant's complaints.  <u>Saelee v. Chater</u>, 83 F.3d 322 (9th Cir. 1996).  I conclude that the ALJ's finding is based on substantial evidence in the record and is free of legal error.

C.    <u>Hand impairment</u>

The ALJ found this alleged impairment not severe because there was no clinical evidence of a condition that could cause Ms. Ramirez's alleged symptoms of being unable to use her hands for any activity, including holding objects and writing.  The ALJ cited the absence of any clinical signs of osteoarthritis in laboratory tests or physical examinations, and that Dr. Wolfson had challenged this diagnosis.  The ALJ also cited Dr. Whitehead's observation that Ms. Ramirez was able to complete paperwork without difficulty and had good handwriting.  The ALJ found no clinical support at all for her testimony that she had muscle and nerve damage.  I agree. Dr. Ireland's findings were negative on nerve conduction studies and needle EMG; Doctors Wolfson and Kofoed reported negative Tinel's and Phalen's tests for nerve damage.  Physical examinations by Doctors Scalapino, Wolfson, Kofoed, Detwiler and Depper revealed no

abnormalities of the upper or lower extremities, back, or shoulders; no sensory or motor deficits;

and normal muscle bulk, strength and tone. On her November 27, 2007 visit to Dr. Detwiler, Ms.

Ramirez denied weakness, numbness or loss of grip strength.

> D.    Degenerative disc disease

The ALJ found not credible Ms. Ramirez's allegations of severe back pain since her

laminectomy in 1988, because the allegations were inconsistent with her ability to engage in

substantial gainful activity for nearly 15 years subsequent to that date.  He further noted that

numerous physical examinations after 1988 had revealed no evidence of stenosis, joint

abnormality, motor deficits, or restricted range of motion.  These findings are based on

substantial evidence in the record and are free of legal error.[5]

With respect to degenerative disc disease of the cervical spine, no objective clinical

evidence supports such an impairment until after Ms. Ramirez's date last insured.  Ms. Ramirez

had the burden of proving the existence of a medically determinable physical impairment up to

her date last insured which had lasted or could be expected to last for a continuous period of not

less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Although in August 2007 Dr. Ireland found two

potential sites of nerve root impingement, at C4-5 and C5-6, these abnormalities did not account

for Ms. Ramirez's reported symptoms of being unable to abduct her right arm at the shoulder,

and there were no EMG findings of denervation.  Dr. Yundt diagnosed radiculopathy arising

from spinal stenosis at C5-6 on January 21, 2008, but this occurred after Ms. Ramirez's date last

insured. The successful surgery fusing the affected cervical discs occurred less than a month after

---

[5] I also note that Ms. Ramirez reported "full recovery" from her laminectomy to Dr.
Kofoed.

diagnosis, on February 12, 2008, precluding Ms. Ramirez from proving that any impairment

from cervical disc disease lasted or could be expected to last at least 12 months.

       E.     <u>Carpal tunnel syndrome</u>

       There is no evidence in the record that Ms. Ramirez was diagnosed with carpal tunnel

syndrome at any time during her insured period.  As noted, Doctors Wolfson and Kofoed

performed Tinel's and Phalen's tests for carpal tunnel syndrome, with negative results. I find no

error in the ALJ's decision that carpal tunnel syndrome was not a severe impairment.

II.     <u>RFC Assessment</u>

       Ms. Ramirez asserts that the ALJ erred in finding that she could transfer skills to other

jobs at step five of the sequential analysis.  Ms. Ramirez relies on <u>Bray v. Commissioner of</u>

<u>Social Security Admin.</u>,  554 F.3d 1219 (9th Cir. 2009).

       In <u>Bray</u>, the court held that the ALJ committed error when he assumed that the claimant

possessed transferable skills without making specific findings in support of that assumption.  The

court, citing SSR 82-41, held:

> When the issue of skills and their transferability must be decided, the . . . ALJ is
> required to make certain findings of fact and include them in the written decision.
> Findings should be supported with appropriate documentation.  When a finding is
> made that a claimant has transferable skills, the acquired work skills must be
> identified, and specific occupations to which the acquired work skills are
> transferable must be cited in the . . . ALJ's decision.

554 F.3d at 1223.  The ALJ found that Bray had "previous skilled work experience," but made no

finding as to the transferability of any acquired skills, did not identify the particular skills the

claimant possessed, and did not explain the basis for the determination that she possessed skilled

work experience.  <u>Id.</u>  It appeared that the ALJ had relied on testimony from a VE that the

claimant's experience as an insurance underwriter approximately 15 years before the hearing had exposed her to computers, customer service and possibly some data entry, and that her work as a medical assistant may also have exposed her to similar skills.  Id. at 1224.  However, the ALJ made no finding whether any skills the claimant acquired by being "exposed to computers" 15 years earlier were still current, much less that they were transferable.  Id. at n.5.  The court observed that it was "impossible to discern whether the VE's brief commentary represents the sole basis for the ALJ's assumption that [claimant] had transferable skills," and that the decision was "silent on the issue of whether the particular skills that the VE identified would be transferable" given the claimant's age and medical impairments.  Id. at 1224.

This case is readily distinguishable from Bray.  The VE identified the DOT classifications for all of Ms. Ramirez's past relevant work and testified that she was precluded from returning to her past relevant work only because, *from a physical standpoint,* that work, *as she had performed it,* was not light exertion work. Other than the exertion level, the VE opined, there was no difference between Ms. Ramirez's past relevant work as performed and the DOT descriptions of those positions.  Tr. 602.  Thus, contrary to Ms. Ramirez's assertion, the VE's testimony established that, with respect to the teaching assistant, skills trainer, and job coach/job developer jobs, there was no difference between the skills of those jobs as Ms. Ramirez had performed them and as described in the DOT.  The VE specifically identified the skills of information clerk as "dealing with the public and dispensing information," tasks which, in the VE's opinion, "she has plenty of experience doing . . . in her past relevant work," including "a long history of skilled employment and working with the general public." With respect to the interviewer position, the VE specifically identified this as an *unskilled* job, requiring no transferable skills.

Page 33 - OPINION AND ORDER

On the basis of this testimony, the ALJ found that Ms. Ramirez had transferable skills in the areas of communication, interviewing, performing evaluations, and relaying information, and identified the specific jobs--information clerk, interviewer, job coach/developer and skills trainer--to which those skills applied.  I therefore reject Ms. Ramirez's argument that the ALJ failed to identify the acquired work skills and specific occupations to which those skills were transferable.

III.    Rejection of Opinions of Doctors Kofoed and Scalapino and Failure to Properly Credit Agency Mental RFC Opinions

Doctors Kofoed and Scalapino each examined Ms. Ramirez on one occasion.  As non-treating physicians, therefore, they were not entitled to the deferential standards applied to either uncontradicted or uncontradicted opinions of treating physicians.  See Holohan v. Massinari, 246 F.3d 1195, 1202 (9th Cir. 2001).

Ms. Ramirez asserts that the ALJ erred in rejecting Dr. Scalapino's diagnosis of bilateral hand osteoarthritis as not supported by objective findings and as contradicted by the opinions of other physicians.  I disagree.  Dr. Scalapino, a rheumatologist, diagnosed bilateral osteoarthritis, a diagnosis rejected by Dr. Wolfson, an orthopedist.  The opinion of a physician in his or her area of specialty is entitled to more weight than the opinion of a nonspecialist.  Holohan, 246 F.3d at 1208; see also 20 C.F.R. § 404.1527(d)(5).  The ALJ did not err in crediting the opinion of Dr. Wolfson in his area of specialty over that of rheumatologist Dr. Scalapino, particularly since there is no indication in Dr. Scalapino's report that she relied on laboratory findings, x-rays or other diagnostic tests for her diagnosis.

Further, there is substantial evidence in the record supporting the ALJ's finding that there was no objective clinical evidence of bilateral osteoarthritis of the hands in the record as a whole, and that other physicians found no indication of osteoarthritis.  Ms. Ramirez's citation of a reference by Dr. Kofoed to an October 1, 1993 record of "suspected overuse syndrome or tendinitis," and a May 13, 1991 x-ray showing a non-displaced fracture at the base of the little finger on the left are unavailing.  These very old records are not probative of osteoarthritis.  It is noteworthy that Dr. Kofoed, an orthopedist, did not himself diagnose osteoarthritis.

Ms. Ramirez also argues that Dr. Scalapino reported many objective abnormal findings, such as tenderness of the spine, diffuse tender points of fibromyalgia, mildly decreased cervical mobility, tenderness of the fingers of both hands, bicep tendon soreness, mild diffuse tenderness of the shoulders, chest wall, and TMJ, diffuse tenderness in the hips and knees, ankles and mid-foot arches, and decreased grip strength.  This argument is unpersuasive.  With the possible exception of decreased grip strength,[6] none of these findings indicates bilateral arthritis of the hands.

Ms. Ramirez asserts that the ALJ erred in rejecting the opinions of Dr. Kofoed, as not based on objective clinical evidence, that Ms. Ramirez had fibromyalgia and that her reported symptoms could be related to repetitive use of the hands such as tendinitis or overuse syndrome.  I find no indication that these opinions were in fact rejected.  The ALJ adopted Dr. Kofoed's opinion that Ms. Ramirez had fibromyalgia, as shown in the ALJ's inclusion of fibromyalgia as a

---

[6] I note that Dr. Wolfson thought that on a test of grip strength, Ms. Ramirez "put out a totally inadequate effort and exaggerated the examination."  Dr. Kofoed found that Ms. Ramirez had intact muscle strength throughout her upper extremities.  Dr. Depper found no joint swelling and Dr. Detwiler found no deformities of the hand or wrist.  Dr. Ireland found "giving way weakness in multiple muscles," an indicator of inadequate effort.

severe impairment.  The ALJ also acknowledged that Dr. Kofoed had raised the possibility of tendinitis or overuse syndrome, and in fact even included Dr. Kofoed's opinion that Ms. Ramirez should be limited to occasional repetitive hand motions in his hypothetical to the VE.  The ALJ adopted Dr. Kofoed's opinion that Ms. Ramirez should be able to alternate sitting and standing.

Further, the absence of objective clinical evidence was not the ALJ's only reason for disbelieving Ms. Ramirez's statements to doctors and her hearing testimony that she was unable to use her hands for any activity, unable to hold objects, and unable to write.  He also noted Dr. Whitehead's observation that Ms. Ramirez had no difficulty completing paperwork, and had good handwriting.

Ms. Ramirez also asserts that the ALJ improperly rejected the November 2003 opinion of the two reviewing psychologists, Doctors Lahman and Hennings, that she was moderately limited in her ability to complete a normal workday and workweek.  The ALJ concluded that, in view of Ms. Ramirez's subsequent work tutoring an autistic teenager and engaging in childcare for up to 7 hours a day, this assessment was "overly generous."  I find no error here.  The rejection of that particular limitation is based on substantial evidence in the record.

IV.    Evaluation of Ms. Ramirez's credibility

The ALJ is responsible for determining credibility.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  However, the ALJ's findings must be supported by specific, cogent reasons.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Unless there is affirmative evidence showing that the claimant is malingering, the ALJ's reasons for rejecting the claimant's subjective testimony must be "clear and convincing."  Id. The evidence upon which the ALJ relies must be substantial.  Id. at 724.  The ALJ found that the record showed such evidence of

malingering as inadequate effort, exaggeration of symptoms, and non-anatomical clinical findings. Regardless of whether the court accepts that finding, I conclude that his reasons for disbelieving Ms. Ramirez are clear and convincing.

Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, and testimony that is vague or less than candid. <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1040 (9th Cir. 2008); <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1040 (9th Cir. 2007). The ALJ made credibility findings based on all of these factors: management of her depression and asthma with medication; failures to follow up with medical practitioners; inconsistent and less than candid statements made to medical and mental health practitioners; and daily activities, such as tutoring a disabled teenager, providing childcare for very young children, and caring for a grandson, which are not compatible with an inability to get out of bed several days a week, debilitating pain, frequent falls, and an inability to use either hand. I find no error here.

## CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated this _____9th_____ day of November, 2010

 /s/ Garr M. King_____
Garr M. King
United States District Judge

Page 37 - OPINION AND ORDER